Robert Anthony REED et al., Plaintiffs,

v.

James A. RHODES et al., Defendants.

No. C73-1300.

United States District Court,
N. D. Ohio, E. D.

May 17, 1979.

James L. Hardiman, Theresa Demchak, Cleveland, Ohio, Nathaniel R. Jones, New York City, Thomas I. Atkins, Roxbury, Mass., for plaintiffs.

Jeremiah Glassman, Michael Sussman, Dept. of Justice, Washington, D. C., for amicus curiae, United States of America.

Mark O'Neill, Weston, Hurd, Fallon, Paisley & Howley, George I. Meisel, James P. Murphy, Squire, Sanders & Dempsey, John H. Bustamante, Cleveland, Ohio, for defendants.

## ORDER

BATTISTI, Chief Judge.

The acquisition of a transportation system has been a problem throughout this desegregation lawsuit. In the early going, the central and recurring theme presented to the Court was the local district's inability to contract for buses because of its unstable financial posture. Bus companies have refused to enter its contracts with the school district without some form of assurance, either an escrow fund or an irrevocable letter of credit, that they would be timely paid.

On October 23, 1978 the United States sought an order requiring the local defendants to establish an escrow fund to insure that bus companies would deal with the school district. The November 6, 1978 order requested state and local defendants to present alternatives to the creation of an escrow fund which would provide adequate security for the bus manufacturers.

In response to the November 6, 1978 order, state defendants suggested that a limited escrow fund be established, if at all, and that responsible vendors would contract with the local defendants if their purchase orders were accompanied by an acceptable letter of credit. The state defendants stated that the local board could receive credit based upon the receipt of funds generated through the sale of vacant land and abandoned buildings by the local school board.[1]

---

1. Dr. Bowers, Assistant Superintendent of Public Instruction for the State Department of Education, has testified that the sale of buildings and land would provide the financial where-

On February 13, 1979, the local defendants acknowledged that they had advertised the sale of 47 properties and reported that the proceeds from any sale "will go into the permanent improvement fund as required by the Ohio Revised Code". The local defendants further stated that these "monies will be used to defray the expense of buses and equipment already purchased [i. e. $1.8 million]." To date, however, the local defendants have not demonstrated that such a fund has been voluntarily created or that it would be used exclusively to defray the past and future costs of purchasing a transportation system for the Cleveland Public Schools.

There is ample authority for the proposition that state and local school officials may be ordered to raise or reallocate funds for the purpose of complying with desegregation decrees.[2] E. g., Bradley v. Milliken, 484 F.2d 215, 258 (6th Cir. 1973). It would be preferable to adopt a method of financing which is as unintrusive as possible on the financial resources of the local school district. The local defendants claim that a local escrow is unnecessary and that the financing of a transportation system should be left to the discretion of the local board. At this state of the litigation, this alternative is unacceptable.

The local defendants have repeatedly failed to assess correctly the potential costs of desegregation.[3] Moreover, they have failed to provide for the inevitable costs of desegregation in any meaningful way.[4] Furthermore, to date, they have never suggested any method by which they would absorb the costs. Since February, 1978, the local defendants have been prodded to voluntarily set up the necessary mechanisms to finance desegregation in the least disruptive way possible. Nevertheless, no suggestions or action have been forthcoming.

No reason has been presented why the proceeds from the sale of excess land and buildings should not be used exclusively for desegregation purposes. The sale of these properties was initially encouraged by this Court for the purpose of financing desegregation. The sales represent a one-shot, unique source of revenue. The revenues are not currently needed for the operation of the schools, are not encumbered by the $20 million dollar state loan, and have a projected value equivalent to the estimated cost of purchasing the requisite number of vehicles.[5] The parties have not indicated that any harm to the school system would be created by the use of these surplus funds for desegregation. In fact, Dr. Bowers has

withal for the local defendants to purchase buses. Proceedings before Special Master, November 8, 1978, p. 267, February 16, 1979 hearing, pp. 150–52.

2. See July 3, 1978 Memorandum of State Defendants Re: Authority of Federal Courts to Order Payment of Funds to Implement Remedial Orders in School Desegregation cases, pp. 1–6.

3. Both Superintendent Briggs and Superintendent Carlin have grossly exaggerated the potential cost of desegregation and have exaggerated its impact on the operation of the Cleveland Public Schools, Superintendent Briggs, affidavit, September 28, 1976, to the Sixth Circuit Court of Appeals, Superintendent Carlin, affidavit, October 26, 1978 to the Sixth Circuit. On November 8, 1978, in proceedings before the Special Master, Superintendent Carlin admitted that he did not know the total cost projections for implementation in February, 1979, though he made cost projections in his affidavit to the Sixth Circuit.

4. For a chronicle of defendants budgetary mismanagement, see Plaintiffs' Motion for Additional Orders and Memorandum in Support, March 15, 1978, Reports of the Special Master, September 30, 1977 and January 13, 1978, State Auditor's Report of Examination of Cleveland City School District, October 6, 1977, and Proposed State Education Committee Report on Cleveland City District Fiscal Problems, June 12, 1978 (Sen. M. Morris Jackson, Chairman). Defendants have continually balanced projected desegregation expenditures in the budget with nonexistent or contingent revenues.

5. The Cleveland defendants are presently involved in selling approximately 47 vacant buildings and parcels of land with an appraised value of approximately ten million dollars and an estimate sale value of five million dollars. February 16, 1979 hearing, Dr. Bowers testimony, p. 145.

testified that such a use of these funds would not have any detrimental impact on the financial condition of the local school district. February 16, 1979 hearing, pp. 141–52.

The land sale money would provide an unintrusive income source which would ensure smooth desegregation. Yet, because of the January 8, 1979 stay of the July 6, 1978 order, which established a state escrow fund, the actual establishment of the escrow account should await further legal developments in the higher courts. Nevertheless, the Court needs to keep informed of the accrual of proceeds from the land sales. Therefore, it is hereby ordered that the local defendants shall file a bimonthly financial accounting which details:

    a. the name, description, date advertised, date bid on, date sold, assessed value and realized value of each land parcel and building advertised, bid on, or sold during the previous two-month period; and,

    b. the accounts in which the revenues from the land sales were placed; and,

    c. the amount and purpose for the expenditure of any of such revenues.

The first bimonthly report shall be submitted on or before June 1, 1979 and shall report the above information for any and all land and buildings advertised, bid or sold since January, 1979. In addition to the reporting procedures identified in court orders, the Business Manager shall sign all the reports required herein.

IT IS SO ORDERED.